**317 A.2d 124.**

RHODE ISLAND OPHTHALMOLOGICAL SOCIETY *et al. vs.* JOSEPH E. CANNON, M. D., *Director of Health, State of Rhode Island et al.*

MARCH 27, 1974.

PRESENT: Roberts, C. J., Paolino, Joslin, Kelleher and Doris, JJ.

KELLEHER, J. This civil suit is essentially a dispute between the state's licensed ophthalmologists and its licensed optometrists.[1] The controversy had its inception in the pas-

---

[1] Opticians and optometrists are licensed in accordance with G. L. 1956, §5-35-1. An optician can furnish lenses on prescription of a licensed optometrist or a licensed physician, put the lens into frames selected by the customer, and fit the frames to the face. The optometrist is authorized to test the strength and acuity of the eyes, to make recommendations as to whether corrective lenses are needed and to determine what types of corrective lenses may be used. He may make up eyeglasses, or fit con-

sage and enactment of P. L. 1971, ch. 229. This statute amended the definition of optometry as found in G. L. 1956, §5-35-1, so that any duly qualified optometrists would be permitted to use certain drugs as they evaluate a patient's vision during the examination of his eyes. The drugs are contained in eyedrop solutions, and when applied to the eye's surface, dilate or contract the pupil or act as a local anesthetic to the eye.

The plaintiffs are the Rhode Island Ophthalmological Society, whose purposes are the "study and advancement of Ophthalmology," and over 20 ophthalmologists who practice in this state. Hereinafter, we shall refer to plaintiffs as "ophthalmologists." The defendants are the state's Director of Health, members of the state Board of Examiners in Optometry and the Chief of Pharmacy of the state's Department of Health. This action began on February 9, 1972. Shortly thereafter the Superior Court permitted the Rhode Island Optometric Association and seven licensed optometrists to intervene as party defendants.

The original complaint alleged that the 1971 legislation encroached on the ophthalmologists' rights and privileges; that it had no reasonable relationship to the health and general welfare of the public; that the use of the drugs by optometrists would endager the public's health; and that by the implementation of the amendment the advancement of ophthalmology "will be seriously retarded." The ophthalmologists sought injunctive relief and a judicial declaration that P. L. 1971, ch. 229, was unconstitutional. The Presid-

---

tact lenses. He may examine the eye to ascertain the presence of "abnormal conditions or functions." His use of topical drugs is limited to those which serve diagnostic purposes.

Any ophthalmologist is a duly trained physician whose specialty is the treatment of eye diseases by the use of medicine and surgery. He is exempt from the provisions of ch. 35 of title 5. He may test one's eyesight, prescribe corrective lenses, and *diagnose* and *treat* a number of eye ailments and injuries.

ing Justice of the Superior Court heard defendants' motion calling for a dismissal of the complaint because it failed to state a claim upon which relief can be granted in accordance with Super. R. Civ. P. 12(b)(6). He granted the motion to dismiss without prejudice, and the ophthalmologists filed an amended complaint. The optometrists filed another motion to dismiss. This motion was heard by another Superior Court justice, who granted the motion. The ophthalmologists have appealed. They raise two issues deserving of some extended discussion. They are, The Law of the Case doctrine and the ophthalmologists' standing to bring suit.

### The Law of the Case

The initial theory of the ophthalmologists' suit was that it was a class action brought on behalf of all ophthalmologists similarly situated, as well as their present and future patients who might seek the assistance of an optometrist who has been allowed to administer the drugs referred to in the 1971 amendment. In dismissing the original complaint, the Presiding Justice ruled that the ophthalmologists had no standing to challenge the legislation in respect to themselves. He also alluded to the long-standing rule relative to the presumption of constitutionality that attaches to an enactment of the General Assembly. The dismissal was without prejudice, and in so doing, the Presiding Justice made the following remarks:

> "Where the physicians assert a right on behalf of their patients to protection against side effects, death and other adverse effects of the practice of this segment of the healing art, and particularly the use of topical drugs, the Court feels that the plaintiffs have a much more serious position. In the light of *Griswold* v. *Connecticut* and other cases which have been decided in this general area, the Court feels that it is not forbidden, at least in recent times, for a professional group to raise as a class, the rights of its patients or those in a sense whom it represents in the practice of its pro-

fession; and that therefore, if a case could be made out that the patients of the ophthalmologists are to be subjected to undue risks of death, danger, blindness and other side effects of the use of drugs, that the plaintiffs would have standing to assert these rights on behalf of their patients; and that in the light of the overwhelming public interest the Court should properly take jurisdiction at the instance of these plaintiffs."

The ophthalmologists argue that these remarks give legitimacy to their right to challenge the optometrists' new activities. They therefore contend that the second trial justice violated the rule of the case when he ruled that the ophthalmologists had no right to invoke the judicial processes of the Superior Court.

When used in the context of this action, the rule of the case refers to the principle that, generally speaking, where, after one justice has decided an interlocutory matter in a pending suit, the same question is presented in the identical manner to another justice of the same court considering another phase of the suit, the second justice should not reverse the ruling of the first justice. *Goldstein* v. *Rhode Island Hosp. Trust Nat'l Bank,* 110 R. I. 580, 296 A.2d 112 (1972); *Columbus Ornamental Iron Works, Inc.* v. *Martin,* 103 R. I. 620, 240 A.2d 405 (1968); *Payne* v. *Superior Court,* 78 R. I. 177, 80 A.2d 159 (1951). No one can quarrel with this rule. However, before its invocation is in order, there has to be a ruling made by the first justice. Here, the Presiding Justice at no time ever decided that the ophthalmologists were proper parties to bring a class action in behalf of their present and future patients.

The Presiding Justice, as he referred to *Griswold* v. *Connecticut,* 381 U. S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), was merely waxing philosophical. He did not rule that the ophthalmologists had the requisite status. In fact, almost immediately after referring to the possible rights of a professional group to bring a class action to protect their pa-

tients, he went on to say that "* * * assuming this standing to assert the constitutional rights of their patients, we must examine the statute itself." The Presiding Justice thereupon stressed that the statute limits permission to apply the topical drugs to only those optometrists who have studied at an accredited institution and then passed an examination conducted by the proper state officials.

There being no ruling by the Presiding Justice, there was no ruling as to the ophthalmologists' standing that would bar a determination of this question by the justice who considered the second motion to dismiss.

## The Ophthalmologists' Standing

In this jurisdiction we find a paucity of cases dealing with the issue of standing. Until recently, it seems that suit had to be initiated in the name of the person whose legal right had been affected. *United Master Plumbers Ass'n* v. *Bookbinder Plumbing & Heating Co.*, 99 R. I. 683, 210 A.2d 573 (1965). In taking this position, the court cited 1 Chitty, *Pleading* ch. 1 at 2 (7th Eng.ed. 1876); Puterbaugh, *Common Law Pleading & Practice* §12 at 8 (10th ed. 1926).

The area of standing in the federal system of adjudication has been in a state of flux. However, it appears that our interpretation of standing to bring suit is consistent with the early federal approach to this doctrine.

Prior to 1970, the federal test for standing had been phrased a number of ways,[2] but, in essence, for a plaintiff

---

[2] Illustrations of criteria used in determining a party's standing are:

(a) "bound to show an interest in the suit personal to himself." *Tyler* v. *Judges of the Court of Registration,* 179 U. S. 405, 21 S.Ct. 206, 45 L.Ed. 252 (1900).

(b) "* * * party who invokes the power must be able to show not only that the statute is invalid but that he has sustained or is immediately in danger of sustaining some direct injury as a result of its enforcement * * *." *Frothingham* v. *Mellon,* 262 U. S. 447, 488, 43 S.Ct. 597, 601, 67 L.Ed. 1078, 1085 (1923).

to be able to maintain suit, some "legal interest" or "property right" of his must have been violated or have been in imminent danger of harm.

The United States Supreme Court, in seeking to dispel the confusion regarding the doctrine of standing, completely rewrote the law in two 1970 decisions, *Association of Data Processing Service Organizations, Inc.* v. *Camp,* 397 U. S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), and its companion case of *Barlow* v. *Collins,* 397 U. S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970).

The Court in *Data Processing* discarded the old concepts of "legal interest"[3] and special statutory protection as found in *Hardin* v. *Kentucky Utilities Co.,* 390 U. S. 1, 88 S.Ct. 651, 19 L.Ed.2d 787 (1968),[4] and the other cases and formulated a two-pronged test. The two aspects of the standard laid down are (1) "* * * whether the plaintiff alleges that the challenged action has caused him injury in fact, economic or otherwise," and (2) "* * * whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Association of Data Processing Service Organizations, Inc., supra* at 152, 153, 90 S.Ct. at 829, 830, 25 L.Ed.2d at 187, 188. An

---

(c) "invaded legal right." *Tennessee Electric Power Co.* v. *Tennessee Valley Authority,* 306 U. S. 118, 59 S.Ct. 366, 83 L.Ed. 543 (1939).

(d) "private damage." *Coleman* v. *Miller,* 307 U. S. 433, 59 S.Ct. 972, 83 L.Ed. 1385 (1939).

[3]The Court noted that the "* * * existence * * * of a 'legal interest' is a matter quite distinct from the problem of standing." *Association of Data Processing Service Organizations, Inc.* v. *Camp,* 397 U. S. 150, 153, 90 S.Ct. 827, 829, 25 L.Ed.2d 184, 188 n.1 (1970).

[4]In *Hardin* v. *Kentucky Utilities Co.,* 390 U. S. 1, 88 S.Ct. 651, 19 L.Ed.2d 787 (1968), the Supreme Court held that a petitioner could challenge federal agency action by demonstrating through an examination of the legislative history of the relevant statute that in enacting the legislation, Congress had intended to protect his interests.

analysis of *Data Processing* indicates that it has its genesis in the case law developed through the years as the Court determined who was adversely aggrieved for the purposes of seeking judicial review under the Administrative Procedure Act, 5 U.S.C. §702 (1964 ed.Supp.IV).

The *Data Processing* bi-partite formula is not binding on us and has been severely criticized by those favoring the single "injury in fact" test. *New Hampshire Bankers Ass'n* v. *Nelson,* 113 N. H. 127, 302 A.2d 810 (1973); Davis, *Administrative Law Treatise* §22-00-1 (1970 Supp.). In fact, shortly after the beginning of 1974, the Supreme Court, in rejecting a class action brought against several Illinois officials for alleged deprivation of civil rights, stressed that "Abstract injury is not enough. It must be alleged that the plaintiff 'has sustained or is immediately in danger of sustaining some direct injury' as the result of the challenged statute or official conduct." *O'Shea* v. *Littleton,* 42 U.S.L.W. 4139 (Jan. 15, 1974).

It is quite apparent from a review of what has gone on both in the federal system and in the jurisdictions of several of our sister states that there has developed a much broader concept of standing than that which prevailed in the days when standing was measured in terms of "legal interests" or "property rights." The position we are about to take is but a logical development of the past pronouncements of this court, having in mind that the ophthalmologists describe ch. 229 in such terms as "unconstitutional encroachment" on their right to practice medicine, "class legislation" favoring the optometrists, an "improper use" of the police power and a "threat" to the public's health, sight and well-being.

In *C. Tisdall Co.* v. *Board of Aldermen,* 57 R. I. 96, 188 A. 648 (1936), the plaintiffs operated markets and delicatessens in the city of Newport. They were also holders of liquor licenses which permitted them to sell at retail bottled

alcoholic beverages. They sought to question the constitutionality of an amendment to the liquor law which would effectively bar them from selling alcoholic beverages along with the other staples usually found in their establishments. The amendment limits sales to premises that were separate and apart from any adjoining market, concession or building. The court, after noting the amendment's alleged adverse impact on the plaintiffs' "economic interests," ruled that they were entitled to a determination of the constitutional issues they had raised. Later, in *McCarthy* v. *McAloon,* 79 R. I. 55, 83 A.2d 75 (1951), the *Tisdall* holding is categorized as the protection of a property right.[5]

An ophthalmologist, however, does not enjoy the same status as that which the law confers on the retail dispenser of beer, wine or liquor. The holding of *MacBeth* v. *Gerber's, Inc.,* 72 R. I. 102, 48 A.2d 366 (1946), would have been dispositive of the ophthalmologists' amended complaint. MacBeth was one of a group of fellow licensed optometrists who were seeking to enjoin the defendant's alleged illegal practice of optometry. The court ruled that the primary goal of the licensing statutes regulating the practice of optometry was the protection of the public from the unqualified practitioner. Such statutes, it was said, did not vest a property right in the licensee. What was said about the optometrists applies equally to the ophthalmologists presently before us. The court in *MacBeth* did observe that the optometrists could have sought the aid of equity if they had alleged "special damage," some direct injury to them

---

[5]At one point, a liquor license was not classified as a property right. *Sepe* v. *Daneker,* 76 R. I. 160, 68 A.2d 101 (1949); *Casala* v. *Dio,* 65 R. I. 96, 13 A.2d 693 (1940). Today, the license, while not viewed as being property in the strict legal sense, is regarded as having some aspect of a property right that protects the possessor from arbitrary action by the local licensing board. *Vitterito* v. *Sportsman's Lodge & Restaurant, Inc.,* 102 R. I. 72, 228 A.2d 119 (1967); *see also, Burton* v. *Lefebvre,* 72 R. I 478, 53 A.2d 456 (1947).

rather than some suffering that they might share in common with the public at large. The optometrists' pleading had failed to particularize the requisite special injury. In dismissing the amended complaint, the trial justice apparently used the no-property right rationale of *MacBeth.*[6] We cannot fault him for his reliance on the rule of *MacBeth.*

Within the past five years, this court in its consideration of what constitutes aggrievance under the Administrative Procedures Act has ruled that one competitor has standing to obtain judicial review of the administrative proceedings granting another competitor a license to locate and operate in the same community as the appellant. *Newport National Bank* v. *Providence Institution for Savings,* 101 R. I. 614, 226 A.2d 137 (1967). We said that "[t]he better-reasoned cases hold that a person who is directly adversely affected in his economic interest by the administrative decision which he challenges has the required standing."[7] *Id.* at 622, 226 A.2d 142.

This court has, on occasion, overlooked the question of standing and proceeded to determine the merits of a case because of the substantial public interest in having the matter resolved. *Sennott* v. *Hawksley,* 103 R. I. 730, 241 A.2d 286 (1968).

The *Newport National Bank* case is the precursor of

---

[6]The plaintiffs have cited numerous cases from other jurisdictions which have found such a property right as is argued for in their brief. However, we espouse the contrary view as represented by *MacBeth* v. *Gerber's, Inc.,* 72 R. I. 102, 48 A.2d 366 (1946).

[7]The ophthalmologists instituted this litigation prior to the implementation of the legislation and the issuance of licenses to those optometrists who successfully passed the required course of study referred to in P. L 1971, ch. 229. While the appeal was pending before us, the Director of Health began to issue licenses. We denied the ophthalmologists' motion asking that we stay the issuances pending a determination of this appeal. *Rhode Island Ophthalmological Society* v. *Cannon,* 112 R. I. 927, 311 A.2d 54 (1973).

today's rule. It is our belief that standing can now be determined by our adoption of the first of the *Data Processing* criteria. The question is whether the person whose standing is challenged has alleged an injury in fact resulting from the challenged statute. If he has, he satisfies the requirement of standing.

Accordingly, we will now examine the amended complaint in the light of our just-adopted standard of injury in fact, economic or otherwise. As we do, we employ the criterion for considering a 12(b)(6) motion which was first expressed in *Bragg* v. *Warwick Shoppers World, Inc.*, 102 R. I. 8, 227 A.2d 582 (1967), and repeated countless times. The allegations in a complaint are, for the purpose of such a motion, to be taken as true and viewed in the light most favorable to the plaintiff and no complaint will be deemed insufficient unless it is clear beyond a reasonable doubt that the plaintiff will be unable to prove his right to relief, that is, unless it appears to a certainty that he will not be entitled to relief under any set of facts which might be proved in support of his claim. When we place the ophthalmologists' allegations alongside of the rule in *Bragg*, the answer is obvious. A reasonable inference to be drawn from the amended complaint is that the ophthalmologists are alleging an economic injury as a result of the Legislature's redefinition of optometry by ch. 229. Such inference satisfies the criterion of *Bragg*. In fact, when the trial justice dismissed the amended complaint, he observed that the entire purpose of the ophthalmologists' complaint was protection of their economic interest.

We believe our holding to be consistent with recent decisions by the Supreme Court liberalizing standing requirements to the point of allowing certain suits to protect the public interest. Despite its liberality, the Court insists that the representative must still allege his personal stake in the controversy—his own injury in fact—before he will have

standing to assert the broader claims of the public at large. *United States* v. *Students Challenging Regulatory Agency Procedures,* 412 U. S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973); *S.* v. *D.,* 410 U. S. 614, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973); *Doe* v. *Bolton,* 410 U. S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973); *Sierra Club* v. *Morton,* 405 U. S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); *Eisenstadt* v. *Baird,* 405 U. S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972).[8]

We emphasize that the ophthalmologists have standing only because of their own injury. They do not satisfy our standing requirements on the basis of any asserted injury to their patients. However, we stress that once their standing has been established, they may present the broader claims of the public at large.

The ophthalmologists' assertion that they have instituted this suit as a class action in behalf of their patients merits a brief comment. Their concern for the public health is laudatory. However, the patient class-action aspect of their suit runs afoul of the requirements of Super. R. Civ. P. 23. A prerequisite of a properly maintainable "class action" is a plaintiff who is a member of the class he purportedly represents. 3B Moore, *Federal Practice* ¶23.04 (2d ed. 1974);

---

[8]The case of *Griswold* v. *Connecticut,* 381 U. S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), involved the Connecticut anti-contraception statute and appellants were individuals who had given information and medical advice to married persons as to the means of preventing conception. The appellants were convicted as accessories for giving such information in violation of the "aiding and abetting" provisions of the statute. They sought, in defense, to raise constitutional rights of the married persons with whom they had a professional relationship. The Supreme Court, distinguishing prior cases, gave standing to assert rights of others on the sole ground that the individuals were accessories. The Court stated:

"Certainly the accessory should have standing to assert that the offense which he is charged with assisting is not, or cannot constitutionally be a crime." *Id.* at 481, 85 S.Ct. at 1680, 14 L.Ed.2d at 513.

Therefore, the holding of *Griswold* as to "standing" is a very limited one.

7 Wright & Miller, *Federal Practice & Procedure* §1761 (1972). The ophthalmologists, because they are ophthalmologists, cannot qualify as patients and they are not, therefore, a member of the class which they seek to represent.

Unlike the United States Constitution, there is no express language in the Rhode Island constitution which confines the exercise of our judicial power to actual "cases and controversies." Despite our broadening of the concept of standing, we will not render advisory opinions or function in the abstract. Litigation will be confined to those appropriate situations where the litigant's concern with the subject matter evidences a real adverseness, *i.e.*, his own injury in fact. However, the pleadings must be something more than an ingenious exercise in the conceivable. *Cf. United States* v. *Students Challenging Regulatory Agency Procedures, supra.* The allegations must be capable of proof at trial.

The plaintiffs' appeal is sustained in part and denied in part. The case is remitted to the Superior Court for further proceedings in accordance with this opinion.

Motion of appellees-intervenors to reargue denied.

*Abedon, Michaelson, Stanzler & Biener, Milton Stanzler, Julius C. Michaelson,* for plaintiffs.

*Richard J. Israel,* Attorney General, for defendants.
*W. Slater Allen, Jr.,* Asst. Attorney General, *Mary Ellen McCabe,* for Joseph E. Cannon, M. D.

*Letts, Quinn & Licht, Frank Licht, Jerome B. Spunt,* for Rhode Island Optometric Association *et al.,* intervenors.