**NEWMAN–CROSBY STEEL, INC.**

v.

**Albert FASCIO et al.**

**Walter KSEN**

v.

**Albert FASCIO et al.**

No. 77–368–M.P., 77–369–M.P.

Supreme Court of Rhode Island.

Dec. 19, 1980.

Hinckley, Allen, Salisbury & Parsons, Michael P. DeFanti, Providence, for Newman-Crosby Steel, Inc.

Roberts, Carroll, Feldstein & Tucker, Richard M. Pierce, Providence, for Walter Ksen.

Joseph R. DeCiantis, Legal Counsel, Bd. of Review, Dept. of Employment Security, Providence, for respondents.

## OPINION

KELLEHER, Justice.

We have consolidated these two petitions for certiorari, one filed by the Department of Employment Security Board of Review (the board) and the other by Walter Ksen (Ksen), an employee of Newman-Crosby Steel, Inc. (Newman-Crosby or the company). Each petitioner asks that we review a Superior Court judgment that reversed the board's finding that Ksen and his fellow employees were entitled to unemployment-compensation benefits for a six-week period commencing on July 28, 1975.

In May of 1975, representatives of Newman-Crosby and Local # 3333, AFL–CIO, United Steel Workers of America (the union)[1] entered into negotiations to reach a new collective-bargaining agreement that would replace the one that was to expire on May 31, 1975. Although these negotiations were unsuccessful, the union membership agreed to continue working under the terms of the expired contract while negotiations for a new contract continued. At the end of June, the company informed the union that the plant would be shut down from July 3 to July 28 for a three-week vacation period. This shutdown represented a departure from the company's long-standing policy of keeping the plant open year round and allowing vacations on a staggered basis. Newman-Crosby attributed the change to deteriorating economic conditions.

On July 1, 1975, the company proposed to the union a "final offer" of settlement which the union membership subsequently rejected. In making this proposal, Newman-Crosby's collective-bargaining representative stated that if the offer was rejected, the company would, as of July 28, termi-

nate all medical and other fringe benefits currently being paid under the previous contract. This ultimatum was confirmed in a letter dated July 23, 1975. Consequently, when the plant "opened" on July 28, Ksen, president of Local # 3333, and sixty-seven other employees appeared at the Employment Security office to claim unemployment security benefits.

The Director of the Department of Employment Security determined that the employees who had applied for benefits were on strike and were therefore subject to the six-week-waiting-period provision of G.L. 1956 (1979 Reenactment) § 28–44–16,[2] in addition to the one-week waiting proviso required by § 28–44–13. Various employees appealed this determination. The board treated Ksen's appeal as a "pilot case" and, pursuant to G.L. 1956 (1979 Reenactment) § 28–44–45, consolidated all of the appeals from the director's decision. Following a hearing, the board overturned this decision, concluding that

"[t]he final offer, dated July 1, 1975, proposed by the company provided for a three-week lay off without any vacation pay and also without certain fringe benefits under the old contract. The law is well established that when an employe[r] makes unreasonable demands upon his employees to return to work and it would be unreasonable for them to accept such a proposal, the resulting work stoppage is a lockout and not a strike. If indeed it is a lockout and the Board has determined that it is, then the claimants are entitled to the benefits claimed by them and no penalty should be imposed on them as it would be if they had caused a strike."

On September 24, 1976, Newman-Crosby filed a complaint in the Superior Court for Providence County, seeking review of the board's decision. The company also moved for a temporary stay pending a hearing, a request that was opposed by Ksen on the

---

1. The union is the authorized collective-bargaining agent for certain employees of Newman-Crosby.

2. The statute provides that "[a]n individual shall not be entitled to benefits except from unemployment which continues subsequent to six (6) weeks in addition to his waiting period, if he became unemployed because of a strike or other industrial controversy in the establishment in which he was employed * * *."

ground that Newman-Crosby was not an aggrieved party as set forth in G.L. 1956 (1977 Reenactment) § 42–35–15(a) of the Administrative Procedures Act. The stay was granted, Ksen moved to dismiss the company's appeal, and a hearing was held on the motion, which hearing led to its subsequent denial. Later, in a written decision, the trial justice reversed the board's decision, stating that "[t]here was no justification in fact or law for the Board to conclude that there was a lockout." He also concluded that even if the board was correct in its conclusion that the work stoppage was a lockout, the six-week waiting period specified in § 28–44–16 would still be applicable because a lockout is in fact an "industrial controversy" within the meaning of § 28–44–16.[3] Both Ksen and the board thereupon filed petitions for certiorari with this court, which petitions were consolidated.

■ Initially, we must address the question of whether the board has any legal standing to seek review under G.L. 1956 (1977 Reenactment) § 42–35–16 of a judicial reversal of one of its decisions. This section permits only a "party in interest, if aggrieved by a final judgment of the superior or district court," to petition the Supreme Court for a writ of certiorari. In order to satisfy this aggrievement requirement, the board must demonstrate that it has incurred an injury in fact. *Matunuck Beach Hotel, Inc. v. Sheldon,* R.I., 399 A.2d 489 (1979); *Rhode Island Ophthalmological Society v. Cannon,* 113 R.I. 16, 317 A.2d 124 (1974). Obviously, the board has not injured in fact when the Superior Court took a different view of Ksen's eligibility for unemployment benefits, and therefore we cannot find that the board itself was aggrieved when its decision was reversed.

We are not convinced that the board comes within either of the well-established exceptions to the general "aggrievement" standards described in *Liguori v. Aetna*

*Casualty & Surety Co.,* R.I., 384 A.2d 308 (1978),[4] for these exceptions apply only to an agency or a head of an agency that is invested with regulatory as opposed to quasi-judicial powers. *Id.* at n.4, 384 A.2d at 311 n.4; *Hassell v. Zoning Board of Review,* 108 R.I. 349, 275 A.2d 646 (1971). We have taken the position that an agency or individual that performs a solely quasi-judicial function has no responsibility for or interest in ensuring that a decision is upheld by an appellate court. *Board of Police Comm'rs v. Reynolds,* 86 R.I. 172, 133 A.2d 737 (1957); *see Bowles v. Danin,* 62 R.I. 36, 2 A.2d 892 (1938). In the case of *Hassell v. Zoning Board of Review,* for example, we determined that the Zoning Board of Review for the City of East Providence, which was not aggrieved in the personal sense, did not have standing to request a writ of certiorari from this court because

"the duties assigned to a zoning board are to hear and determine appeals from decisions of administrative officials charged with the enforcement of zoning legislation, and, in addition to pass on applications for special exceptions or variances. * * * These are its only responsibilities. It has no others for the limits on its authority have been circumscribed as well as proscribed by the Legislature. Neither directly nor by implication is the obligation to act as a representative of the public interest included within those limits." *Id.* at 352, 275 A.2d at 648.

■ In contrast, a governmental official, agency, commission, or board charged with the responsibility of administering a particular set of rules and regulations designed to promote the public safety and welfare acts for the people and, as such, must be permitted to represent the people when a matter of public interest is involved. See, for example, *Matunuck Beach Hotel, Inc. v. Sheldon,* R.I., 399 A.2d 489 (1979); *Liguori v. Aetna Casualty & Surety Co.,* R.I., 384 A.2d 308 (1978); *Altman v. School Committee,*

---

3. See footnote 2.

4. According to *Liguori v. Aetna Casualty & Surety Co.,* R.I., 384 A.2d 308 (1978), these

exceptions occur if the public has an interest in the issue beyond that of the immediate parties or if the lower tribunal's judgment would otherwise escape review.

115 R.I. 399, 347 A.2d 37 (1975); *Buffi v. Ferri*, 106 R.I. 349, 259 A.2d 847 (1969); *Tedford v. Reynolds*, 87 R.I. 335, 141 A.2d 264 (1958); *Board of Police Comm'rs v. Reynolds*, 86 R.I. 172, 133 A.2d 737 (1957).

■ Within the Department of Employment Security (the department), the board performs a quasi-judicial function. This role has been defined by the Legislature through such statutes as G.L. 1956 (1979 Reenactment) §§ 28–43–14, 28–44–41, and 28–44–47, which give the board appellate review of certain decisions rendered by the director and the appeal tribunals. It is the director, however, who has been entrusted with the administration of the department's rules and regulations, and she is therefore considered to be the guardian of the public interest in the area of unemployment security. The Legislature has established this role for the director in G.L. 1956 (1979 Reenactment) § 28–42–31, which provides:

"It shall be the duty of the director to administer chapters 42 to 44 * * * and he shall have the power and authority to enforce all the reasonable rules and regulations which may be adopted as provided elsewhere in said chapters and all orders necessary or suitable to that end, and to employ any persons, make expenditures, require reports and take any other action, within his means and consistent with the provisions of said chapters, necessary or suitable to that end."

When we accept as given the board's quasi-judicial function and bear in mind our pronouncements in *Hassell v. Liguori*, we find that the board lacks the requisite standing that would justify our issuance of a writ of certiorari.

Newman-Crosby and Ksen have briefed a number of issues before us, but the dispositive issue in this case concerns Newman-Crosby's standing to appeal the board's decision to the Superior Court. In order for such standing to exist, the company was required to demonstrate that it was "aggrieved" within the meaning of § 42–35–

15(a) by the board's exempting Ksen and his fellow employees from the six-week-waiting-period proviso to which we have previously alluded. To put this conclusion in its proper focus, we shall briefly set out the statutory scheme existing at the time of the controversy whereby an employer is required to pay a tax that serves as a source of benefits to an unemployed worker.

The Employment Security Act (the act) requires any employer subject to its provisions to pay a quarterly tax that is assessed annually upon a certain percentage of the employer's payroll. The proceeds of this tax become part of the Employment Security Fund. The amount paid by each employer is affected by two factors: the particular contribution schedule in effect at the time the tax is imposed and the employer's experience rate. The use of a particular contribution schedule is dependent upon the status of the fund's reserve ratio.[5] The employer's experience rate is directly related to the amount of unemployment benefits that have been paid out of the employer's account (funded by the employer's contribution) during the preceding experience year that ends on each September 30. An employer who maintains a stable rate of employment during the experience year is rewarded by being allowed to pay a lower payroll tax than an employer who is unable to maintain a stable rate of employment. This approach is oftentimes referred to as merit rating. See *Rosbro Plastics Corp. v. LaMantia*, 105 R.I. 719, 254 A.2d 734 (1969).

At the time this controversy was before the trial justice, the employer's tax was allocated by the department to two separate accounts, the employer's account described above and an account called the solvency account. The solvency account was funded by deducting from the employer's contribution a percentage that is fixed by statute and is unaffected by the employer's experience rate. Benefits paid under the act were charged either to the employ-

---

**5.** General Laws 1956 (1979 Reenactment) § 28 43 8 (1980 Cum.Supp.) lists nine different contribution schedules.

er's account or to the solvency account depending on the nature of the payment.[6] When the negative balance of the employer's account exceeded minus 4.2 percent, the portion of the negative balance exceeding minus 4.2 percent was to be charged to the solvency account.[7] When the negative balance reached minus 4.2 percent, the experience rate for the following year would not have been increased beyond the maximum rate then in force despite the payment of further benefits attributable to the employer.[8]

Testimony at the December 9, 1976 hearing on Ksen's motion to dismiss indicated that if the department had paid the benefits in question prior to September 30, 1976, the end of the company's experience year, the benefits would have had to have been paid from the solvency account. As the trial justice observed,

"If [the benefits are] charged to a prior year, namely the year ending September 30, 1976, it won't affect the rate of payment into the fund by Newman-Crosby Steel. They had been paying the maximum rate * * * based on last year's figures, and will for the next year."

The trial justice denied the motion to dismiss, however, on the theory that

"if the payment of $33,000 for these employees is charged to the next year, it may have an effect on the rate at which Newman-Crosby will pay into the Employment Security fund. That isn't known yet. In all probability, if the $33,000 is paid to the employees and charged

to this year, it wipes out any chance of Newman-Crosby lowering its payment rate below five percent * * *."

■ The trial justice accurately assessed the economic effects of making benefit payments in the experience year ending September 30, 1976, and that beginning October 1, 1976, but he chose to base his determination of Newman-Crosby's standing on the effect of payment in the latter experience year.[9] Ksen argues that the trial justice should have examined Newman-Crosby's standing to appeal the board's decision as of the date the company filed its appeal in the Superior Court. We agree. It is an appellant's first duty to establish affirmatively that he is sufficiently aggrieved so as to acquire standing. *Varney v. Look*, 377 A.2d 81 (Me.1977). This showing must be based on the facts existing at the time the action is brought; it cannot depend on circumstances that may exist sometime after suit is commenced.

■ The benefits in this case became due on September 22, 1976, the date of the board's decision. Thus, when Newman-Crosby filed its appeal on September 24, 1976, it could not be considered an aggrieved party subject to an injury in fact, for, as the testimony at the hearing on the motion to dismiss indicated, the unemployment benefits would have been paid out of the solvency account. There would therefore be no effect on the employer's account or its experience rate for the new experience year beginning October 1, 1976.

---

**6.** General Laws 1956 (1979 Reenactment) § 28-43 2(b) lists several benefits paid the claimant which were chargeable to the solvency account, including the amount payable as an allowance for the claimant's dependents. Section 28–44–6 authorizes the payment of dependents' allowances. The maximum weekly payment under this provision is $20.

**7.** General Laws 1956 (1979 Reenactment) § 28–43–2(b)(2).

**8.** General Laws 1956 (1979 Reenactment) § 28–43 -8, which in 1976 contained seven contribution schedules.

**9.** Parenthetically, we would point out that even assuming the trial justice was correct when he said a lockout could be considered as another

"industrial controversy" within the ambit of § 28–44–16, it is conceivable that the benefits paid the locked-out employees could have been charged to the solvency account. General Laws 1956 (1979 Reenactment) § 28–43–3(b)(4) authorized the director, upon a proper showing, to charge § 28–44–16 benefits to the solvency account unless a "final determination is made by a federal or state agency having jurisdiction, that the employer involved was guilty of an unfair labor practice in connection with the labor dispute * * *." There is nothing in this record which indicates any involvement by the National Labor Relations Board or Rhode Island's State Labor Relations with the 1975 dispute.

██ Newman-Crosby also argues that it is aggrieved in fact by the board's decision, for the benefits in question increased the total unemployment-compensation payments withdrawn from the solvency account. Since all employers contributed to the solvency account, the company contends that "if total benefits are greater, more taxes will be paid by employers." The trial justice did not employ this rationale when he afforded the company standing, and our review of the record reveals that Newman-Crosby presented no evidence to indicate that the fixed percentage of total taxable wages that each employer is required to pay into the solvency account would have been increased by the board's decision. The company's contention is premised on speculation, for we cannot find any basis in this record demonstrating that employers who come within the provisions of the act would have been required to increase their contributions to the solvency account [10] because of the $33,000 + due Newman-Crosby's employees.

Accordingly, the petition for certiorari sought by the board is hereby denied and dismissed, while Ksen's petition for certiorari is granted, the judgment of the Superior Court is quashed, and the records certified are remanded to the Superior Court with our decision endorsed thereon.

DORIS, J., was present at oral argument but did not participate in the decision.

---

**10.** At this point it should be noted that the General Assembly, at its January 1979 session, amended the Employment Security Act in several respects. The changes which are relevant to our discussion were prospective. The solvency account became known as the balancing account, and an employer may no longer look to the balancing account as a source of payment if the employer's account has a negative balance. Negative balances are no longer chargeable to the balancing account.