DECISION
This declaratory judgment action is before the Court for a ruling on the Plaintiffs' pending Motion for Summary Judgment and the Defendants' pending Motion to Dismiss. Two over-arching questions raised by the Complaint. First, does a taxpayer have standing to challenge the Rhode Island General Assembly's authority to operate a discretionary, state-wide charitable grant program (the legislative grant program, so-called) that donates public funds to local and private organizations for purposes that may or may not be related to the performance of *Page 2 
some legislative duty? If yes, then, does the General Assembly's administration of Rhode Island's legislative grant program exceed its authority under the Rhode Island Constitution and separation of powers principles? Jurisdiction is pursuant to G.L. 1956 § 9-30-1.
 I Facts and Travel
Many of the facts surrounding this controversy generally are known and are not reasonably disputed. At the time the instant lawsuit was filed, Plaintiff Robert Watson was the Rhode Island House Minority Leader and a member of the Joint Committee on Legislative Services, a committee created pursuant to chapter 11 of title 22 of the General Laws. The Plaintiffs — Mumford, Story, McManus, Long. Loughlin, Savage, Trillo, Moffitt, and Ehrhardt — were members of the Rhode Island House of Representatives. Likewise, the Plaintiffs' attorneys, Nicholas Gorham and Steven Coaty, were also members of the House of Representatives. The Plaintiffs and their attorneys made up the entire Republican minority in the House of Representatives. Separate and apart from their official capacities as lawmakers, however, the Plaintiffs brought this action in their capacities as Rhode Island citizen taxpayers.
The Complaint names Defendant William Murphy in his official capacity as Speaker of the Rhode Island House of Representatives and Chairman of the Joint Committee on Legislative Services. The Complaint also names Defendant Joseph Montalbano in his former capacity as President of the Rhode Island Senate and Vice Chair of the Joint Committee on Legislative Services. Both Defendants are Democrats. According to the Plaintiffs, they deliberately refrained from suing the Defendants in their individual capacities, notwithstanding their belief that the Defendants have acted ultra vires. The Plaintiffs also state that they assume that the Defendants acted in good faith. Accordingly, they do not accuse the Defendants, the Joint *Page 3 
Committee on Legislative Services, or the General Assembly of corruption, wrongdoing, ethical violations, bad faith, or other misfeasance of office.
At issue is a program that is widely known as the legislative grant program. It consists of a discretionary assistance program operated by the General Assembly, through its leadership, and through which the General Assembly makes charitable donations of public funds to local and private organizations to be used for purposes seemingly unrelated to the legislative task or the performance legislative duties. According to the Plaintiffs, the Republican minority has been battling with the Democratic majority for years about the program. It has long been these minority lawmakers' contention that the manner in which both the grant recipients are selected and the funds are disbursed is unfair, unlawful, and creates a potential for conflicts of interest and appearances of impropriety. They also maintain that the program is open to manipulation by the legislative leadership in order to gain political advantage within the House and Senate.
After years of frustration, the Plaintiffs filed the instant lawsuit. Thereafter, they filed this Motion for Summary Judgment. Notwithstanding the arguments raised in the Plaintiffs' written filings, their aim, plainly, is to leave the program intact and under the control of the General Assembly while reducing, if not eliminating, the potential for manipulation by the Majority Leadership for political purposes.
The Plaintiffs filed their Complaint on June 17, 2008. On July 16, 2008, without having conducted any discovery, the Plaintiffs filed their Motion for Summary Judgment pursuant to Super. R. Civ. P. 56. On July 25, 2008, the parties entered into a stipulation allowing the Defendants until August 25, 2008, to respond to the Complaint. Thereafter, in lieu of an Answer, the Defendants, pursuant to Super. R. Civ. P. 12(b)(6), filed their Motion to Dismiss in which *Page 4 
they raised, inter alia, the question of the Plaintiffs' standing to bring this lawsuit. The Defendants also filed a written objection to the Plaintiffs' Motion for Summary Judgment.
By agreement, the parties were heard on their cross motions on October 28, 2008. The motions were argued extensively in open court, at which time the Plaintiffs both expounded upon the facts surrounding the administration of the program and clarified the nature and extent of their requests for relief, including the legal basis for those requests. According to the Plaintiffs, although their Complaint is premised upon the FY2008 State Budget Act and the events surrounding the legislative assistance appropriations for that fiscal year, they seek prospective relief only — in no small part because they neither wish to join the grant recipients as parties to this action, nor place any of those recipients in jeopardy of having to repay funds that the Plaintiffs contend were distributed unlawfully. Put simply, the Plaintiffs ask this Court to fire a shot across the bow of the Defendants' ship to warn them about their past transgressions, deter them from proceeding as they have in the past, and, in the future, carry on more consistently with the Plaintiffs' scheme of things. In the alternative, the Plaintiffs seek this Court to instruct the Defendants on how to go about making the legislative grant program constitutionally tolerable.
As the Plaintiffs state in their Motion for Summary Judgment, assistance programs have been a staple of state government in Rhode Island for decades. In fact, all three branches of government manage some form of assistance, either incidental to the execution of their constitutional powers or in furtherance of the administrative operations attendant to those powers. The Plaintiffs have no quarrel with State assistance programs in general; instead, their fight is motivated by the manner in which the legislative grant program currently is controlled and directed by these Defendants. *Page 5 
The recipients of the FY2008 legislative grants upon which the instant litigation is premised are identified in a roster that has been made part of the exhibits in this case. The roster lists each of the payees and the amount received; however, it provides no specific details or requirements as to how the recipients should expend such funds.
Facially, the list of payees appears to be made up of organizations arguably positioned to expend the funds for legitimate public purposes. Nevertheless, it is not subject to reasonable dispute that these organizations are local, private, or both; therefore, they would not be expected to put the funds to legislative purposes. In other words, based upon the identities of the recipients, it may be reasonable to conclude that the funds were expended such that they conferred a benefit on the public as a whole; however, they are not organizations that one would expect to employ the funds incidental to the performance of some legislative duty. For example, in FY2008, public funds budgeted to the General Assembly were disbursed to local sports programs, social and civic organizations, senior and tenants organizations, fire districts, schools and libraries, charities, schools and parent teacher organizations, and the like. None of the parties disputes the obvious nature of these organizations but, notably, none have come forward with evidence, one way or the other, about the specific use to which any of these organizations put their grant funds.
It is a matter of public record that the current recipient selection process was approved by the General Assembly's Joint Committee on Legislative Services in an open meeting on March 31, 2005. The Joint Committee on Legislative Services was created in 1960 by the Legislature when it adopted chapter 11 of title 22 of the General Laws. Section 22-11-3 gives the Committee the power to act upon all administrative matters affecting the operation of the *Page 6 
General Assembly.[1] The minutes of the March 31, 2005 meeting are contained in the instant record.
According to said minutes, the legislative grant program consists of a process that is triggered when any member of the General Assembly, regardless of party affiliation, undertakes to initially sponsor a grant recipient. The process would require a preliminary eligibility review; an invitation to apply for funds; review and approval by the leaders of each chamber of the General Assembly; public notice; accountability and reporting requirements; and random compliance audits. Also according to the minutes, Plaintiff Robert Watson, in his capacity as a lawmaker, wanted more control over the internal administration process of the legislative grant program. He contended that the process carried with it the appearance of being subject to the unfettered and unwelcome control of one individual in each legislative body.
After a public discussion of the process requirements, the Joint Committee approved the grant administration process as articulated by its members during the March 31, 2005 meeting. Representative Watson cast the only dissenting vote. The Committee did not discuss the constitutionality of the grant program itself. The General Assembly then continued to operate the legislative grant program for the next several years with the Plaintiffs, as lawmakers, raising their ongoing objections to their lack of involvement in the process, as well as to what they viewed as the legislative leaderships' unfettered control over said process.
In early 2007, as part of the FY2008 state budget process, the General Assembly submitted to Governor Donald L. Carcieri a request for 2.3 million dollars in appropriations for legislative assistance.See G.L. 1956 § 35-3-1 et seq. and article 9, section 15 of the Rhode Island Constitution. The appropriations request was identified merely as "Assistance, Grants, *Page 7 
and Benefits." As part of the budget process and against the historical backdrop concerning how the General Assembly administered its budget appropriations, including the legislative grant program funds, Governor Carcieri presented the General Assembly's generally identified, albeit not specifically itemized, appropriations requests as part a multi-volume publication containing hundreds of pages. It is undisputed that the source of the grant money is not the executive branch and that the executive branch's only role in the process is the ministerial; that is, its role is to issue the checks upon the demand of the General Assembly's leadership.
Thereafter, it was lawmakers Watson, McManus, Story, Erhardt, and Gorham, who condensed the proposed budget into 24 pages and introduced the original FY 2008 budget bill on February 1, 2007. Although their bill was predicated on the Governor's submissions, it did not detail the scores of line items that made up the final budget total, including the requested 2.3 million dollars in legislative assistance funds, the recipients of which had yet to be determined.
In March 2007, Representative Gorham introduced 2007-H5998. Bill 2007-H5998 was aimed at amending chapter 3 of title 35 of the General Laws, which governs the administration of funds appropriated to the General Assembly, and would have required that all grants specifically be itemized in the annual State Budget Act. The proposed amendment provided:
 "It is enacted by the General Assembly as follows:
 SECTION 1. Chapter 35-3 of the General Laws entitled "State Budget" is hereby amended by adding thereto the following section:
 35-3-28. Legislative grants. — All legislative grants awarded by the general assembly must be included in the annual state budget and must include the following information:
 (1) Recipient's name and address;
 (2) Name of contact person for the grant recipient;
 (3) Name of the legislator who sponsored the grant;
 (4) Statement of whether the finance committee of either or both houses of the general assembly have had a hearing on the proposed grant; and
 (5) Brief description of the nature and purpose of the grant. *Page 8 
 SECTION 2. This act shall take effect upon passage." 2007-H5998.
The bill died in committee.
Meanwhile, Governor Carcieri ultimately vetoed the final version of the FY 2008 Budget Act. Thereafter, however, more than two-thirds of each chamber of the General Assembly voted both to approve the Act and to override the Governor's veto. Thus, the General Assembly's appropriations requests, including its request for 2.3 million dollars in the nebulous "Assistance, Grants, and Benefits," became a part of the State's official financial plan.
After the FY2008 Budget Act was adopted by the General Assembly, the Defendants began the process of determining which organizations would receive legislative grant monies, as well as how much they would receive. Some of these organizations were sponsored by the Plaintiffs in their capacities as lawmakers. The Plaintiffs filed the instant lawsuit just 23 days before the end of the State's 2008 fiscal year and after most, if not all, of the grant monies already had been distributed.
 II Standard of Review
Under the Uniform Declaratory Judgment Act (UDJA), the Superior Court possesses "the power to declare rights, status, and other legal relations whether or not further relief is or could be claimed." Section 9-30-1; see also P.J.C. Realty v. Barry, 811 A.2d 1202, 1207 (R.I. 2002) (quoting § 9-30-1). Thus, "the Superior Court has jurisdiction to construe the rights and responsibilities of any party arising from a statute pursuant to the powers conferred upon [it] by G.L. chapter 30 of title 9, the Uniform Declaratory Judgments Act." Canario v.Culhane, 752 A.2d 476, 478-79 (R.I. 2000). Specifically, § 9-30-2 of the Uniform Declaratory Judgments Act provides as follows: *Page 9 
 "Any person interested under a deed, will, written contract, or other writings constituting a contract, or whose rights, status, or other legal relations are affected by a statute, municipal ordinance, contract, or franchise, may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract, or franchise and obtain a declaration of rights, status, or legal relations thereunder." Section 9-30-2
(Emphases added.)
It is well-established that a trial court's "decision to grant or to deny declaratory relief under the [UDJA] is purely discretionary."Sullivan v. Chafee, 703 A.2d 748, 751 (R.I. 1997). "This statute gives a broad grant of jurisdiction to the Superior Court to determine the rights of any person that may arise under a statute not in its appellate capacity but as a part of its original jurisdiction." Canario,752 A.2d at 479 (citing Roch v. Harrahy, 419 A.2d 827, 830 (R.I. 1980)). Further, this Court acknowledges that the purpose of the UDJA is "to allow the trial justice to `facilitate the termination of controversies.'"Bradford Assocs. v. R.I. Div. of Purchases, 772 A.2d 485, 489 (R.I. 2001) (citations omitted). It is axiomatic that "[a] declaratory-judgment action may not be used for the determination of abstract questions or the rendering of advisory opinions, nor does it license litigants to fish in judicial ponds for legal advice."Sullivan v. Chafee, 703 A.2d 748, 751 (1997) (internal citation and quotations omitted). However, "the mere fact that a court is being asked to render an advisory opinion does not automatically preclude a declaratory judgment in all situations." Id. at 752.
Although our Supreme Court has in the past required a petitioner to present the Court with an actual controversy when seeking declaratory relief, (see Millett v. Hoisting Eng'rs Licensing Div. of Dep't ofLabor, 119 R.I. 285, 291, 377 A.2d 229, 233 (1977)), it recently has pronounced that "[b]y contrast with the federal courts, our jurisdiction is not limited by an inflexible constitutional `cases and controversies' requirement." Chambers v. Ormiston, 935 A.2d 956, 960 (R.I. 2007) (citing Rhode Island Ophthalmological Society v. Cannon, 113 R.I. 16, *Page 10 
28, 317 A.2d 124, 130 (1974)). However, such a relaxation of the requirement does not permit a trial justice to "dispense with the traditional rules prohibiting them from rendering advisory opinions or adjudicating hypothetical issues." Millett, 119 R.I. at 291,377 A.2d at 233; see also Chambers v. Ormiston, 935 A.2d at 960 (stating that "it is our policy not to rule on abstract questions. . . .") .
In a declaratory judgment action, "the first order of business for the trial justice is to determine whether a party has standing to sue. A standing inquiry focuses on the party who is advancing the claim rather than on the issue the party is seeking seeks to have adjudicated."Bowen v. Mollis, 945 A.2d 314, 317 (R.I. 2008). Accordingly, "[t]he requisite standing to prosecute a claim for relief exists when the plaintiff has alleged that `the challenged action has caused him [or her] injury in fact, economic or otherwise[.]'" Id. (quoting RhodeIsland Ophthalmological Society v. Cannon, 113 R.I. 16, 22,317 A.2d 124, 128 (1974)).
Furthermore, "[w]hen called upon to decide the issue of standing, a trial justice must determine whether, if the allegations are proven, the plaintiff has sustained an injury and has alleged a personal stake in the outcome of the litigation before the party may assert the claims of the public." Id. (citing Burns v. Sundlun, 617 A.2d 114, 116 (R.I.1992)). Such a "legally cognizable and protectable interest must be concrete and particularized . . . and . . . actual or imminent, not conjectural or hypothetical." Id. (quoting Pontbriand v. Sundlun,699 A.2d 856, 862 (R.I. 1997)) (internal quotations omitted).
 III The Plaintiffs' Claims and Requests for Relief
As set forth above, questions of standing ordinarily are to be addressed as an initial matter. See State v. Nunez, 588 A.2d 124, 124
(R.I. 1991) (mem.) (observing that the trial *Page 11 
justice should have addressed the issue of standing prior to reaching the merits). However, given the overall presentation of the Plaintiffs' complaints, contentions, and requests for relief, some discussion of the substance of their claims must be undertaken in order to clarify questions of standing: whether the Court has been presented with a justiciable controversy; whether any controversy is moot; and whether the Court should decline jurisdiction.
The Complaint is verified and squarely challenges the constitutionality of the legislative grant program on constitutional separation of powers principles. The Complaint requests declarations of law from this Court including a declaration that
 "the Speaker of the House of Representatives and the President of the Senate cannot make any expenditure of funds appropriated for "legislative grants until such time as:
 a.) such appropriation is passed with sufficient particularity, or such grants are made pursuant to a statutory process with a declared a [sic] legislative purpose, that establishes a primary standard for carrying out the use, or lays out an intelligent principle to which the administrative officer or body must conform, so as to enable the executive branch to carry out such appropriation, or
 b.) such appropriation is passed and approved by at least two-thirds of the membership of each chamber of the General Assembly."
Notably, however, and notwithstanding the declaration sought in their Complaint, the Plaintiffs, by way of their motion papers and oral argument, retreated from the notions that the challenged public grant program must be (1) administered by the Executive Branch of government "pursuant to a statutory process with a declared legislative purpose that establishes a primary standard for carrying out the use, or lays out an intelligent principle to which the administrative officer or body must conform, so as to enable the executive branch to carry out such appropriations" and (2) "passed and approved by at least two-thirds of the membership of each chamber of the General Assembly." *Page 12 
Indeed, although the substance of their separation of powers argument is fundamentally unchanged, the Plaintiffs now assert that "the current grant program supervised by the Speaker and the President could be made constitutional by doing nothing more than putting the grants, line by line, into the annual state budget before the general assembly votes on it." (Memorandum in Support of Plaintiffs' Motion for Summary Judgment at 16.) Thus, the Plaintiffs seemingly would have the Court endorse the constitutionality of the legislative grant program so long as it is operated along lines paralleling the contents of 2007-H5998; namely, Representative Gorham's ill-fated proposed amendment to chapter 3 of title 35, which would have required all legislative grants to be delineated in each year's state budget law and, presumably, would have freed sponsors and recipients alike from the unfettered discretion of the Defendants. In a somewhat disjointed fashion, the Plaintiffs offer alternative legal theories in support of their request for this relief.
First, the Plaintiffs contend that the General Assembly's vote to adopt the FY2008 Budget Act was invalid or, at least, that its approval of funds used for legislative grants was invalid. The Plaintiffs contend that the budget bill which they, as lawmakers, introduced to the House of Representatives was so generalized that the members of the General Assembly, including themselves, could not have understood they were being asked to approve 2.3 million dollars for legislative "Assistance, Grants, and Benefits," some or all of which was to be doled out under the auspices of the legislative grant program.
Thus, according to the Plaintiffs, their vote on the grant appropriations was an empty one because the appropriations were not sufficiently delineated and, further, that this rendered the vote of each member of the General Assembly meaningless and, presumably, void. With that premise, the Plaintiffs attempt to negate the two-thirds vote by virtue of which the General *Page 13 
Assembly overrode the Governor's veto and passed the FY2008 Budget Act. From that precarious underpinning, the Plaintiffs further argue that the funds appropriated for FY 2008 legislative grants were in violation of Article 6 Section 11 of the Rhode Island Constitution, which prohibits the appropriation of public funds for private or local purposes unless approved by a two-thirds vote of both chambers of the General Assembly. Although this aspect of the Plaintiffs argument is aimed at the factual circumstances and requests for declarations set forth in their original Complaint, it seemingly holds little relevance to the declaration that the Plaintiffs now seem to seek; namely, a declaration that possible constitutional deficiencies in future legislative grant program expenditures can be cured simply by itemizing the grants within the State Budget Act.
As vital as their public-funds-for-private-purposes fact-based assertions may be to their argument, the Plaintiffs quite remarkably ignore the standards for ruling on a Rule 56 motion for summary judgment and offered no evidence — through their own affidavits, or those of any other member of the General Assembly, or any grant recipient — that any of the funds at issue were spent for any particular purpose, be it legislative or otherwise.[2] Instead, the Plaintiffs fall back upon an unsupported argument that the mere payment of funds to what are undeniably private or local entities, is prohibited by Article 6 section 11 as a matter of law.
Similarly, the Plaintiffs fail to proffer so much as their own affidavits, as lawmakers, to suggest that they, or any other members of the General Assembly, did not understand that the FY2008 Budget Act included a 2.3 million dollar lump-sum appropriation, some or all of which would be disbursed by the Defendants as part of the legislative grant program. Nor do they *Page 14 
proffer any evidence that the General Assembly somehow lacked a meaningful opportunity to vote against the Budget Act due to its lack of specificity, a lack of transparency in the budget process, or for any other reason. Again, the Plaintiffs urge this Court to make these determinations as a matter of law, based solely upon the face of the FY 2008 Budget Act. In this way, the Plaintiffs whistle past the core question essential to their underlying separation of powers analysis: that is, are the legislative grant funds being used for purposes incidental to the performance of a legislative task or duty?
The Plaintiffs argue that the FY2008 Budget Act and chapter 11 of title 22[3] violate separation of powers principles and the non-delegation doctrine because both the Budget Act and chapter 11 of title 22 purport to allow a state legislative committee to appropriate and administer the expenditure of public funds for non-legislative purposes. The Plaintiffs also baldly state that the Defendants are neither legislating nor performing any duty reasonably incidental to the legislative task. (See Memorandum in Support of Plaintiffs' Motion for Summary Judgment at 11-12.) In keeping with these allegations, the Plaintiffs conclude that the grant making process begins and ends in the legislature, with the de facto appropriation of funds taking place when the Defendants designate the grant recipients and distribute funds budgeted for the General Assembly. Yet, the Plaintiffs' purported solution of itemizing the grants within the State Budget Act turns its back on the over-arching question of whether or not the Legislature has the authority to unilaterally distribute public funds for non-legislative purposes in the first instance.
Problematica for the Plaintiffs is that their proposed solution ignores the fact that the state budget merely is a financial plan designed to assess the need for annual appropriations, identify sources of funds, and serve as a guide for actual spending. As such, however, there is *Page 15 
no actual requirement that the budgeted funds must be spent or even spent as projected by the plan. So, the taxpayer Plaintiffs' proposed solution might provide them, as lawmakers, with more leverage in their quarrels concerning the identification of potential recipients of the funds, the amount that should be paid, and when such payments should be made. However, the Plaintiffs' purported cure nonetheless leaves the expenditure of the funds to the judgment and discretion of the legislative branch, whose actions are enshrouded with a cloak of finality. Such a proposed solution begs, but leaves unanswered, the initial separation of powers question concerning whether the legislative grant funds are being used for purposes incidental to the performance of a legislative task or duty. See State ex rel. West Virginia CitizensAction Group v. West Virginia Economic Development Grant Committee, 580 S.E.2d 869, 894 (W.Va. 2003) (striking down a legislative grant scheme because it violated of the separation of powers, the appointment power and the delegation of power provisions of the state constitution). As noted above, the Defendants filed written objections to the Plaintiffs' Motion for Summary Judgment. However, the Defendants gave separation of powers principles short shrift and, like the Plaintiffs, stayed clear of any evidence that would shed light on the question of how the grant monies actually were spent, as well as whether they were spent for legislative purposes.
 IV Standing and Jurisdiction
As grounds for their Motion to Dismiss, the Defendants argue that the Plaintiffs lack standing; that they failed to join necessary parties; and that the case presents no case or justiciable controversy such that this Court's subject matter jurisdiction can properly be invoked. The Defendants further argue that the Plaintiffs' lawsuit is a thinly disguised attempt to obtain an advisory opinion from this Court, which opinion this Court has no power to give. The *Page 16 
Defendants further observe that courts should not inject themselves into political controversies and should avoid matters better left to the voters. See City of Pawtucket v. Sundlun, 662 A.2d 40, 58 (R.I. 1995) ("It is not the function of the judicial branch to resolve issues that amount to political questions."); State v. Champa, 494 A.2d 102, 105-06
(R.I. 1985) (declining to resolve an issue that the Court considered to be a political question).
At oral arguments on the motion, the Defendants also raised the question of this Court's subject matter jurisdiction. They contend that the Plaintiffs' claims brought over the FY2008 budget are moot because the State's fiscal year 2008 has ended and the funds already have been expended.
Notwithstanding the parties' dogged skirting of the core substantive issue, the instant litigation squarely raises the question of whether the General Assembly, acting through its leadership, exceeds the parameters of its constitutional authority and usurps executive branch functions when it distributes public funds for non-legislative purposes. This separation of powers question has substantive import and there is a substantial public interest in determining whether the Rhode Island General Assembly has usurped executive functions by appropriating and expending public funds for non-legislative purposes. Furthermore and although it seems obvious that this dispute is politically motivated, the mere fact that the Plaintiffs' motivation may be political does not necessarily render the dispute itself political. See McCarthy v.McAloon, 79 R.I. 55, 60, 83 A.2d 75, 77 (1951) ("Political questions involve political rights as distinguished from civil, personal or property rights. A political right is exercisable in the administration of government and involves power to participate directly or indirectly in its management."). *Page 17 
Additionally and although the precise factual questions presented by the FY2008 budget expenditures may be moot, the controversy is one that history reveals could occur annually while potentially evading review with every the change in the budget year and turnover in political leadership. See City of Cranston v. Rhode Island Laborers' Dist. CouncilLocal, 1033 960 A.2d 529, 533 (R.I. 2008) ("One narrow exception to the mootness doctrine exists for those cases that are `of extreme public importance, which [are] capable of repetition but which [evade] review.'") (quoting Arnold v. Lebel, 941 A.2d 813, 819 (R.I. 2007));Sullivan v. Chafee, 703 A.2d 748, 752 (1997) (stating that "the issuance of declaratory relief has been deemed appropriate only when the question(s) presented, although technically moot or deficient in some other respect, involved issues `of extreme public importance, which are capable of repetition but which evade review[]'") (quoting Morris v.D'Amario, 416 A.2d 137, 139 (1980)).
Conversely, however, and fatal to the Plaintiffs' interests in bringing this lawsuit, it is undisputed that the Plaintiffs suffered no injury beyond that suffered by the general populace and that they, therefore, cannot meet the injury-in-fact test. See Bowen v.Mollis, 945 A.2d 314, 317 (2008) ("The requisite standing to prosecute a claim for relief exists when the plaintiff has alleged that `the challenged action has caused him injury in fact, economic or otherwise[.]'") (quoting Rhode Island Ophthalmological Society v.Cannon, 113 R.I. 16, 22, 317 A.2d 124, 128 (1974)). Furthermore, because of the longstanding and regular recurrence of the question, there is no time element here that would impel this Court to leap-frog over traditional standing requirements as in Sennot v. Hawksley,103 R.I. 730, 731-32, 241 A.2d 286, 287 (1968) (declining to resolve the questionable standing of a taxpayer, acting in his individual capacity, because of time considerations and the fact that the case raised an issue of "substantial public interest[.]") In light of these circumstances, the Court is compelled to grant the Motion to *Page 18 
Dismiss on grounds of lack of standing. See Ahlburn v. Clark,728 A.2d 449, 451 (R.I. 1999) ("In deciding whether a particular plaintiff possesses the requisite standing, a court should draw the line not between whether the plaintiff has suffered a substantial injury or an insubstantial injury, but between injury and no injury.").
As further support for this conclusion, the Court observes that Rhode Island's citizens are not so lacking in remedies that the requirements of standing should be ignored: both the legislative leadership and the Governor are equally empowered to seek an advisory opinion from the Supreme Court concerning the constitutionality of the Legislature's use of its funds for non-legislative purposes. If all else fails, the Plaintiffs, along with the rest of the State's citizenry, have a remedy in the voting booth — if not from their public officials. See AssociatedBuilders Contractors of Rhode Island, Inc. v. Department ofAdmin., 787 A.2d 1179, 1186 (2002) (observing that it only will relax standing requirements on rare occasions where there exists a "substantial public interest in having a matter resolved");Blackstone Valley Chamber of Commerce v. Public Utilities Com'n,452 A.2d 931, 932-933 (1982) (standing only should be overlooked where there is a "substantial public interest in having a matter resolved before the question presented became moot").
Equally important, this dispute — at least in the manner presented to the Court by these parties — invites a political solution to an in-house legislative branch quarrel rather than a final disposition of the core separation of powers question. McCarthy, 79 RI at 62, 83 A.2d at 78
("Suits for the public should be placed in public and responsible hands."). Accordingly, this Court would decline to exercise jurisdiction even if the Plaintiffs could demonstrate that they have standing.See Roch v. Garrahy, 419 A.2d 827, 830 (1980) (recognizing that the inappropriateness of the subject matter for judicial consideration is designated as *Page 19 
"nonjusticiability" and that conversely, "in an appropriate case involving a party with adequate standing, the Superior Court could well consider a controversy. . . ."); see also Sundlun, 662 A.2d at 58
(recognizing that political questions are "not justiciable in . . . court because of the separation of powers provided by the Constitution[]").
As noted above, the Plaintiffs retreat from, and the Defendants avoid, the important constitutional question of whether legislative spending of public funds for non-legislative purposes must come to a halt because it violates separation of powers principles. The Plaintiffs' have abandoned their well-reasoned argument that the program cannot be constitutionally maintained unless
 a.) such appropriation is passed with sufficient particularity, or such grants are made pursuant to a statutory process with a declared a [sic] legislative purpose, that establishes a primary standard for carrying out the use, or lays out an intelligent principle to which the administrative officer or body must conform, so as to enable the executive branch to carry out such appropriation, or
 b.) such appropriation is passed and approved by at least two-thirds of the membership of each chamber of the General Assembly.
Such abandonment appears to be due to the Plaintiffs' preferred outcome; namely, to leave the legislative grant program intact. Accordingly, not only do they encourage this Court to overlook questions about how the funds are spent, but they also urge the Court to condone the program by declaring that any constitutional infirmities can be cured by the simple expediency of particularizing the proposed grants and grant recipients in the State Budget Appropriations Act — a declaration that would carry the added benefit of giving the Plaintiffs, as lawmakers, a greater voice in this constitutionally dubious process. Thus, by the nature of their request for relief, the Plaintiffs have transmogrified this controversy into a political one — notwithstanding the important substance of the separation of powers question. *Page 20 
 V Conclusion
The Defendants' Motion to Dismiss is granted due to the Plaintiffs' lack of standing and the political nature of the relief sought. Accordingly, the Court does not reach the substantive issues raised by the Plaintiffs' Motion for Summary Judgment.
Counsel shall prepare an order consistent with this decision.
[1] Section 22-11-3(a) of the General Laws provides in pertinent part: "It shall be exclusively the responsibility of the joint committee to act upon all administrative matters affecting the operation of the general assembly. . . ."
[2] At the time of the oral arguments on the pending motions, Plaintiffs wrapped themselves tightly in their taxpayer garb, claimed ignorance about the purposes for which the funds had been approved, and offered no evidence, one way or the other, about how the grant monies — including those that they themselves had sponsored in their capacity as lawmakers — were to have been spent.
[3] As part and parcel of their argument, Plaintiffs challenge the constitutionality of chapter 11, title 22, but only to the limited extent that the statute, arguably, might authorize the Defendants to appropriate state funds outside the budget appropriations process, which it clearly does not. *Page 1