[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
DECISION
Plaintiffs in this action seek an injunction barring the Governor of the State of Rhode Island from publicly disclosing certain records relating to individuals who have received State pension benefits as a result of so-called "special legislation" enacted by the General Assembly. The Providence Journal Company ("the Journal") and one of its staff writers have been permitted to intervene as party-defendants. The Governor intends to release the following records:
 Records showing the name, the amounts contributed, when contributions were made, the total number of credits purchased, the total amounts paid for credits, when credits were purchased, the type of credits purchased, the amounts paid for each credit, and the benefits paid to recipients or prospective recipients of pensions received or to be received by way of any legislative act of the General Assembly that enables the recipient to purchase or otherwise receive credits in the state retirement system at less than the full actuarial cost of such credits and/or to receive pension benefits not normally available to a member of the state retirement system in the absence of such legislative act.
With the consent of all parties this Court issued a temporary restraining order on March 6, 1991, enjoining any such disclosure until the case could be heard and decided on its merits. In the interim the Court has received helpful briefs from all of the parties. A hearing on the merits was held on April 18, 1991, and the Court heard arguments from the parties as well as fromamici curiae.[1]
Plaintiffs base their request for injunctive relief on RIGL §38-2-1, et seq., known as the Access to Public Records Act ("APRA" or "the Act"), which received legislative passage on May 5, 1979 and took effect on July 1, 1979. More particularly, the plaintiffs rely upon § 38-2-2(d)(1) of the Act, which provides in relevant part:
 (d) "Public record" or "public records" shall mean all documents, papers, letters, maps, books, tapes, photographs, films, sound recordings, or other material regardless of physical form or characteristics made or received pursuant to law or ordinance or in connection with the transaction of official business by any agency. For the purposes of this chapter, the following records shall not be deemed public:
 (1) All records which are identifiable to an individual applicant for benefits, . . .; including, but not limited to, personnel . . . records. . . .
The Governor argues that although the designated records will identify the recipients of such pension benefits, APRA does not automatically bar their release, such disclosure being nonetheless subject to traditional balancing tests and common law precepts. (Governor's brief at 14-15.) The Journal contends that the subject materials are not "personnel records" but are, instead, "strictly budgetary" in nature. (Journal's brief at 7.) Both the Governor and the Journal contend that irrespective of any alleged confidentiality which might have attached to the records, the recipients who have benefitted from such special legislation have waived any supposed right or privilege to have the records held in confidence. (Governor's brief at 20-22; Journal's brief at 4, 7.) Further, it is contended by the Journal that the plaintiffs are without standing to bring an action to bar disclosure under APRA. (Journal's brief at 10-14.)
For the reasons set forth herein, this Court denies the plaintiffs' motion to enjoin the release of the records and holds that all of the subject records may be publicly disclosed.
The defendants challenge the plaintiffs' standing to bring this action. They contend that APRA is principally a disclosure statute and that it does not encompass or invite an action to enjoin disclosure. The plaintiffs claim standing under RhodeIsland Ophthalmological Society v. Cannon, 113 R.I. 16,317 A.2d 124 (R.I. 1974) and Ciba-Geigy Corp. v. Local No. 2458, UnitedTextile Workers of America, 391 F. Supp. 287 (D.R.I. 1975). The plaintiffs are mistaken. Neither the Act nor judicial decisions support the plaintiffs' contentions, and their reliance onCannon and Ciba-Geigy is misplaced.[2]
An examination of APRA and the decisions from our Supreme Court subsequent to its enactment discloses, without question, that the dominant objective of the Act is disclosure, not secrecy. If ever a court were justified in reading a statute, not narrowly as through a keyhole, but in the broad light of its intended purpose, it is here.
APRA, like the federal Freedom of Information Act ("FOIA"),5 U.S.C. § 552, and the myriad open records statutes passed by other states, was intended to increase the public's access to agency records, with a view toward "enhanced public participation in government." Charlesgate Nursing Center v. Bordeleau,568 A.2d 775, 777 (R.I. 1990). In every case in which our Supreme Court has had occasion to review APRA, the Court has acknowledged that the Act's essential purpose was disclosure. The Rake v.Gorodetsky, 452 A.2d 1144, 1146 (R.I. 1982) (acknowledging the public's essential right to know and have access to information held by the government, citing federal law); HydronLaboratories, Inc. v. Department of Attorney General,492 A.2d 135, 137, 139 (R.I. 1985) ("Generally, APRA was intended to open up various state government documents to inspection by private citizens and news-gathering entities in order to enhance the free flow of information. . . . [APRA's exemptions] should usually be construed narrowly so as to further the legislative purpose of facilitating public access to governmental records."); PawtucketTeachers Alliance Local No. 920, AFT, AFL-CIO v. Brady,556 A.2d 556, 558 (R.I. 1989) ("With the passage of [APRA] the Rhode Island Legislature enhanced the First Amendment right of the public and the press to know and have access to information held by various public agencies. . . . We are mindful that the basic policy of the act is in favor of disclosure."); CharlesgateNursing Center v. Bordeleau, supra, 568 A.2d at 777 (noting the "legislative consensus that documents possessed by public bodies in the course of their supervisory activities should generally be made public"); Providence Journal Co. v. Kane,577 A.2d 661, 663 (R.I. 1990) (acknowledging "that the basic policy of the APRA favor[s] disclosure"). See, Department of AirForce v. Rose, 425 U.S. 352, 361 (1979).
A review of all of these authorities invites the unmistakable conclusion that APRA is a statute whose principal and evident purpose is disclosure, not secrecy. The instant action, however, may be referred to as a "reverse-APRA" suit, which seeks toenjoin disclosure of agency records. All of the APRA cases thus far considered by our Supreme Court, except one, were instituted as a result of requests for access to agency materials. TheCharlesgate Nursing Center case was the only action which resulted from a request to enjoin disclosure. No party in that case, however, raised the issue of the Nursing Center's right to petition for injunctive relief; accordingly, it was not addressed by the Supreme Court. Such a challenge has, however, been made here, and it is an issue of first impression in this jurisdiction.
Since APRA "generally mirrors" the FOIA, our Supreme Court has indicated that federal precedent is of assistance when interpreting our own statute. Pawtucket Teachers Alliance LocalNo. 920, AFT, AFL-CIO v. Brady, supra, 556 A.2d at 558 n. 3.See, Braverman and Heppler, A Practical Review of State OpenRecords Laws, 49 Geo. Wash. L. Rev. 720, 727 (1981).[3] In this regard, the Court finds instructive the United States Supreme Court decision in Chrysler Corp. v. Brown, 441 U.S. 281
(1979). There the Court expressly held that the FOIA does not invite an action to enjoin release of agency records:
 This case belongs to a class that has been popularly denominated "reverse-FOIA" suits. . . [which] seeks to enjoin agency disclosure. . . . We agree with the Court of Appeals for the Third Circuit that the FOIA is purely a disclosure statute and affords Chrysler no private right of action to enjoin agency disclosure.
 * * *
 Chrysler contends that the [FOIA's] nine exemptions in general. . . reflect a sensitivity to the privacy interests of private individuals and nongovernmental entities. That contention may be conceded without inexorably requiring the conclusion that the exemptions impose affirmative duties on an agency to withhold information sought. In fact, that conclusion is not supported by the language, logic, or history of the Act.
 * * *
 That the FOIA is exclusively a disclosure statute is, perhaps, demonstrated most convincingly by examining its provision for judicial relief. Subsection (a)(4)(B) gives federal district courts "jurisdiction to enjoin the agency from withholding
agency records and to order the production of any agency records improperly withheld from the complainant" . . . . That provision does not give the authority to bar disclosure, and thus fortifies our belief that Chrysler, and courts which have shared its view, have incorrectly interpreted the exemption provisions of the FOIA. [441 U.S. at 285, 291, 292. Emph. added.]
An examination of APRA leads this Court to follow the holding in Chrysler Corp. Like the FOIA, APRA is devoid of any reference to an injunctive avenue by which an individual may seek to block disclosure of records. To the contrary, the Act, in a series of related subsections, provides redress only to a complainant who has been denied access. In general, the steps which lead to judicial review are as follows:
 Step 1: Denial of access (§ 38-2-7). An applicant who is denied access to records is to be notified of such denial by the appropriate agency official. Failure to so notify is deemed a denial of access.
 Step 2: Administrative Appeals (§ 38-2-8). The applicant who has been denied access may petition the chief administrative officer of the agency to review the initial decision denying access to the records. If the chief agency official upholds the denial of access:
 (A) The applicant may petition the Attorney General for assistance in accessing the records. If the Attorney General determines that the applicant has a meritorious claim for access to the records, the Attorney General may seek injunctive or declaratory relief on behalf of the applicant in the Superior Court; or,
 (B) The applicant may retain private counsel and seek injunctive or declaratory relief in the Superior Court.
 Step 3: Jurisdiction/Judicial Review/Burden of Proof (§ 38-2-9;-10). The Superior Court shall then hear any cases "brought under this chapter" to determine whether the records sought may be withheld from public inspection. The burden of proof in all such actions is upon the public agency to demonstrate that the subject records can be withheld from public inspection.
These provisions of the Act are not in alien juxtaposition to each other. A plain reading of these sections in pari materia unambiguously indicates that it is only the aggrieved applicant, who has actually been denied access, who may employ the mechanics of administrative appeal and seek injunctive relief in Superior Court. These mechanisms are specifically geared toward and are entirely consistent with the dominant objective of the Act: disclosure, not secrecy. City of Philadelphia v. Doe,405 A.2d 1317, 1319 (Pa. Cmwlth. 1979) ("Indeed, this Act affords judicial relief only to a citizen who is denied a right of access. . . . This remedy is exclusive." [Emph. added.]). See, Carlson v. Pima County, 687 P.2d 1242, 1246 (Ariz. 1984).
To read into the Act, by inference or implication, a provision which would accord the plaintiffs a right to enjoin the release of records would not only be antithetical to the statute's paramount purpose of disclosure, it would also violate cardinal principles of statutory construction. It is a fundamental rule that a court will not adopt a construction which would defeat the evident purpose of a statute. State v. Gonsalves, 476 A.2d 108, 111 (R.I. 1984). Where, as here, a statute is free of ambiguity and expresses a clear and definite meaning, there is no room for statutory construction or extension, and the court must five the words of the statute their plain and obvious import. State v. Calise, 478 A.2d 198, 200 (R.I. 1984); Kastal v. Hickory House, Inc. 95 R.I. 366. 369. 187 A.2d 262, 264 (R.I. 1963); Providence Journal Co. v. Kane, supra, 577 A.2d at 664.
This Court, in the absence of any contrary authority in Rhode Island, believes it appropriate to follow Chrysler Corp., and holds that APRA does not afford these plaintiffs any right to enjoin disclosure.[4] In so holding, the Court aligns itself with the United States Supreme Court and with other jurisdictions, which have also held that the exemptions under access to records statutes are not mandatory bars to disclosure of agency records. Tobin v. MichiganCivil Service Commission, 331 N.W.2d 184, 188 (Mich. 1982);Carlson v. Pima County, supra, 687 P.2d at 1246; Capital CitiesMedia, Inc. v. Chester, 797 F.2d 1164, 1182 (3rd Cir. 1986) (construing Pennsylvania law); Westinghouse Broadcasting Co.,Inc. v. Sergeant-at-Arms of General Court, 375 N.E.2d 1205, 1209 n. 9 (Mass. 1978). As was said by the Supreme Court in ChryslerCorp., from which there was no dissent:
 Enlarged access to governmental information undoubtedly cuts against the privacy concerns of nongovernmental entities, and as a matter of public policy some balancing and accommodation may well be desirable. We simply hold here that Congress did not design the FOIA exemptions to be mandatory bars to disclosure.
 * * *
 We therefore conclude that Congress did not limit an agency's discretion to disclose information when it enacted the FOIA. It necessarily follows that the Act does not afford Chrysler any right to enjoin agency disclosure. [441 U.S. at 293, 294. Emph. added.]
In Tobin, supra, the Michigan Supreme Court, also without dissent, held with regard to that state's freedom of information act:
 The ability to make a discretionary disclosure not required by the FOIA does not allow a public body to disregard other substantive limitations on disclosure. For example, the right of privacy . . . or other laws may affirmatively prohibit disclosure of information under certain circumstances. However, a party suing to prevent
disclosure must rely on that substantive law to prevent disclosure. The FOIA provides no assistance for the plaintiff in a reverse FOIA lawsuit. In effect, a reverse FOIA suit to prevent disclosure of information within a FOIA exemption must be evaluated as if the FOIA did not exist. [331 N.W.2d at 188. Emph. added.]
Accordingly, to the extent that supposed privacy rights may be implicated by an agency's discretionary decision to release records, those such as plaintiffs herein, who seek to bar such disclosure may not do so under APRA for lack of standing.[5]
They must find their remedy, if any, elsewhere. What is clear, however, and what is held herein, is that the instant plaintiffs do not have standing to maintain a petition for injunctive relief under APRA in an effort to bar the disclosure of the subject records.
In so holding, this Court recognizes that it need not reach the merits of the other issues raised in the briefs or at the hearing. A petitioner's lack of standing ordinarily invites no further inquiry by the court, and the case would normally be concluded at that initial juncture. Since, however, this Court's holding may invite appellate review, the Court feels obliged to consider the remaining substantive issues.
* * *
It is also clear is that these plaintiffs may not rely upon APRA as a repository of substantive rights of privacy. The Act is a disclosure statute. It is not at all an enactment which begat a substantive right to privacy, an entitlement which had clearly been rejected at common law in this State and which would remain unrecognized until 1980. Champlin v. Washington Trust Co. ofWesterly, 478 A.2d 985 (R.I. 1984).[6]
There is nothing in APRA which evidences or reflects the requisite legislative intent which would accord that statute the dimensions of an act which created a substantive right to privacy. Moreover, firmly rooted laws of statutory construction in this jurisdiction preclude this Court from inferring or supplying any such intendment. It is well established in this State's jurisprudence that Rhode Island follows the common law, which governs the rights and obligations of its citizens, unless that law has been clearly and intentionally modified by the legislature. State v. Ibbison, 448 A.2d 728, 732 (R.I. 1982). Rhode Island courts subscribe to the well-recognized rule that not only must statutes in derogation of the common law be narrowly and strictly construed, they shall not — absent the clearest of legislative intentions or expressions — abrogate or supersede the common law. Atlantic Refining Co. v. Director ofPublic Works, 104 R.I. 436, 441, 244 A.2d 853, 856 (R.I. 1968);Pucci v. Algiere, 106 R.I. 411, 420-21, 261 A.2d 1, 7 (R.I. 1970); Traugott v. Petit, 122 R.I. 60, 65, 404 A.2d 77, 80 (R.I. 1979), Souza v. O'Hara, 121 R.I. 88, 91, 395 A.2d 1060, 1061 (R.I. 1978).
Our legislature, well cognizant of and deferential to the common law, has been extraordinarily clear when it goes about abrogating common law principles. Such enactments have carried with them explicit and clear language which is unmistakably intended, even to the casual reader, to signal a departure from common law precepts. For example, in Pucci v. Algiere, supra,
the Supreme Court said:
 The general rule is that statutes in derogation of the common law must be strictly construed. However, that rule is not applicable here because of the express language of the statute in question [which] provides:
 "This act shall be construed most favorable to the town of Westerly, its intention being to give same community the fullest and most complete powers possible concerning the subject matter hereof." [106 R.I. at 421, 261 A.2d at 7-8.]
No such all-encompassing or plenary language is contained in APRA.[7] If the General Assembly had intended to create or establish a substantive and actionable right of privacy through APRA, in derogation of the common law's rejection of any such right, it gave no clue or intimation of any such intention. Consequently, this Court will neither supply it nor infer it.Ayers-Schaffner v. Solomon, 461 A.2d 396, 399 (R.I. 1983) ("[W]here the Legislature intends to alter the common law, such alteration must be plainly expressed and will not be inferred by the court."); Atlantic Refining Co. v. Director of PublicWorks, supra, 104 R.I. at 441, 244 A.2d at 856 (an entitlement not known at common law requires the court to "adhere to the long revered and often reiterated principle of strictly construing statutes in derogation of the common law so as not to extend liberally the limitations or regulations which the legislature has deemed worthy of enacting."); Shaw v. Northern Penn. RailwayCo., 101 U.S. 557, 565 (1879) ("[A statute] is not to be construed as making any innovation upon the common law which it does not fairly express.").
No plain or fair reading of APRA discloses or demonstrates the necessary clear intention of our General Assembly to endow the Act with an actionable, substantive right of privacy, an entitlement plainly unrecognized and eschewed at common law, and, indeed, an entitlement which would not be finally inaugurated and recognized by our legislature until a full year after APRA's passage. Henry v. Cherry Webb, 30 R.I. 13, 41, 43, 73 A. 97, 108, 109 (R.I. 1909) ("[N]one of the instances given recognize or support the right of privacy in the common law. . . .' [T]he so-called "right of privacy" has not yet found an abiding place in our jurisprudence, and as we view it, the doctrine cannot now be incorporated without doing violence to settled principles of law by which the profession and the public have long been guided.").
In Kalian v. PACE, 122 R.I. 429, 431-32, 408 A.2d 608, 609 (R.I. 1979), the Supreme Court flatly rejected an invitation to engraft to this State's laws, by judicial rule, an individual's right to maintain an action for invasion of privacy. Adverting toHenry, the Kalian court emphasized that "if the right of privacy should become necessary or desirable, it would be the function of the Legislature to enact legislation to insure this right." "We agree," said the Court, "that from the standpoint of sound public policy, the creation of new rights of action in the field of individual privacy is a question for the consideration of the Legislature."
Kalian was decided in November of 1979. APRA was passed by the legislature in May of 1979, and the Act took effect on July 1, 1979. The Kalian court could scarcely have been unaware of APRA's codification earlier that same year. In Kalian, the Supreme Court, by its very silence, declined in any way to recognize APRA as an act evincing legislative intent to create substantive rights of privacy. Were it otherwise, the Kalian
court would have had no reason to exhort the legislature to establish laws which addressed intrusions upon privacy rights. 122 R.I. at 432. In its very next session, spurred by the prodding it had just received from Kalian,[8] and a full year after it had enacted APRA, the General Assembly passed a statute (RIGL § 9-1-28.1) which expressly and for the first time in this State identified actionable and substantive rights of privacy.[9]
The fact that there now exists in this State a right to privacy statute does not, however, afford the plaintiffs a medium through which they can, in automatic fashion, seal from public view the records which are at issue in this case. That statute simply created a limited right of action in order to remedy a tortious invasion of one's privacy. The plaintiffs' instant petition is neither couched in nor grounded upon allegations of tortious intrusions of privacy. Even under a right to privacy statute such as ours, a court would be obliged to apply a balancing test, at least from the standpoint of "reasonableness," to determine the validity of any such claim. See, Newspapers,Inc. v. Breier, 279 N.W.2d 179, 186 (Wisc. 1979).[10]
Since common law principles have not been eroded by the passage of APRA, this Court believes that traditional balancing concepts should be applied in this case in order to determine whether the designated records should be publicly disclosed. It is the view here that the applicable test is a fulcrum which has its roots in the common law, and one which reflects striking an appropriate balance between privacy interests and the strong interest in maintaining an informed citizenry. Such balancing would be consistent not only with this State's right to privacy statute, but it also would be reflective of the many cases which have addressed, in such balanced fashion, similar issues relating to an individual's privacy interests versus the citizenry's compelling interest in knowing how its public fisc is being administered and expended.
In Carlson v. Pima County, supra, the Arizona Supreme Court held that its access to records statute did not limit common law doctrine and was not intended to overrule traditional balancing schemes:
 We hold today that the common law limitations to open disclosure are not based on any technical dichotomy which might be argued under the "public records" or "other matters" wording of [the statute], but rather are based on the conflict between the public's right to openness in government, and important public policy considerations relating to protection of either the confidentiality of information, privacy of persons or a concern about disclosure detrimental to the best interests of the state. This has been the general basis for the common law rule. [687 P.2d at 1245.]
In Nowack v. Fuller, 219 N.W. 749, 750 (Mich. 1928), the court considered a mandamus action brought by a Michigan citizen to compel that state's Auditor General to allow access to certain records relating to the expenditure of public money. The plaintiff was also the editor and publisher of a Michigan newspaper, and he intended to publish the records in his newspaper so that the readers would be aware of the manner in which public funds had been expended to underwrite expenses incident to the entertainment of a recent annual Conference of Governors. The Auditor General denied access to the records, claiming that there was no public interest therein and that the plaintiff had no special interest in them, either. Since there was no open records statute in the state at that time,[11] the Michigan Supreme Court, in granting the writ of mandamus, considered the issue in the context of the common law:
 In the absence of any statutory grant of inspection, the question in issue must be determined by a consideration of the general common-law principles relative to the right of citizens to inspect public documents and records. . . . Undoubtedly it would be a great surprise to the citizens and taxpayers of Michigan to learn that the law denied them access to their own books, for the purpose of seeing how their money was being expended and how their business was being conducted.
 * * *
 The citizens and taxpayers of this state are interested in knowing whether the public business is being properly managed. By denying the plaintiff access to the public records for the purpose of securing such information, he is deprived of legal rights for which he is entitled to redress by the writ of mandamus.
In Samuel D. Warren and Louis D. Brandeis' seminal articleThe Right to Privacy, 4 Harv. L. Rev. 193 (1890), the authors recognized a right of privacy, but opined that such a right did not bar the publication of any matters which were "of public or general interest." Id. at 214. This initial pronouncement still begged a determination of what is "of public or general interest." In Bloustein, The First Amendment and Privacy: TheSupreme Court Justice and the Philosopher, 28 Rutgers L. Rev. 41 (1974), Dr. Bloustein noted that the issue focuses "on whether or not the information is relevant to the public's governing purposes." "`Public interest,' taken to mean curiosity, must," he said, "be distinguished from `public interest,' taken to mean value to the public of receiving information of governing importance." Id. at 54, 57. In Watkins v. United States,354 U.S. 178, 200 (1957), the Supreme Court remarked:
 [T]here is no . . . power to expose for the sake of exposure. The public is, of course, entitled to be informed concerning the workings of its government. That cannot be inflated into a general power to expose where the predominant result can only be an invasion of the private rights of individuals.
This Court is firmly of the belief that disclosure of the subject records will in no way or manner approach a level which can somehow be construed as exposure merely for the sake of exposure, so as to result in an unreasonable invasion of personal privacy. Certain pension arrangements, outside the norm, have been legislatively ceded to individuals who ordinarily would not be entitled to receive such public endowments. It has been represented, without contradiction, that during the last fiscal year approximately $85 million was extracted from Rhode Island taxpayers to fund this State's retirement account, and that in excess of $133 million was paid out in the form of retirement benefits. (Exhibit 1 to Governor's brief.)
This Court can perceive no overriding privacy interest on the part of the recipients of such uncommon benefits which would in any manner outweigh the citizenry's predominant interest in knowing exactly how its public fisc is being administered, and whether it is being administered in evenhanded fashion. See,Attorney General v. Collector of Lynn, 385 N.E.2d 505, 509 (Mass. 1979) ("[A]ny invasion of privacy resulting from the disclosure of the records . . . is also outweighed by the public's right to know whether the burden of public expenses is equitably distributed.") As was said with great propriety by the West Virginia Supreme Court in State ex rel. Charleston MailAssn. v. Kelly, 143 S.E.2d 136, 139 (W. Va. 1965):
 It is indeed difficult to envision a greater interest in public records which reflect the handling of public funds than that of a citizen and taxpayer whose own contribution to the public funds is directly involved. His is a real interest. It is such that, in the absence of some compelling reason to the contrary, he should be entitled to inspect the records pertaining thereto.
Indeed, a forceful argument has been advanced that the beneficiaries of such funds have effectively waived any confidentiality which somehow might have attached. The instant case, like others of this ilk, invites a finding of implied waiver. E.g., Doe v. Sears, 263 S.E.2d 119, 123 (Ga. 1980);Mid-America Television Co. v. Peoria Housing Authority,417 N.E.2d 210, 213 (Ill. App. 1981). See also, Jeffers v. City ofSeattle, 597 P.2d 899 (Wash. App. 1979). "In other words," theMid-America court said, "people receiving money from the State for services rendered forfeit some privacy interest." 417 N.E.2d at 213. If a public employee's privacy and confidentiality interests may be sacrificed "for services rendered," it follows ineluctably that such interests have even less significance where, as here, the recipients of public funds provided no services at all to the State of Rhode Island, but simply bought credit for expansive pension benefits at substantially less than the going rate.
This Court finds illogical plaintiffs' unappealing suggestion that named individuals, who are actually identified in such special pension legislation, have not waived purported claims of privacy. Further, it is the view here that the unidentified recipients, who were the beneficiaries of the special "formula" or "generic" bills, have also yielded any suggested notions of privacy. No sound reason has been advanced to cloak these recipients with anonymity. They have garnered the same or similar benefits which the named recipients have reaped. There is no basis upon which their special harvests should be accorded some mystical deference.
This Court holds that those who would enrich themselves with pension benefits flowing from such special legislation cannot shroud their gain in a mantle of confidentiality or secrecy when they avail themselves of the public fisc. Such individuals must be deemed to have sacrificed any cramped notions of privacy by partaking of public benefits at bargain prices not otherwise available to state employees who fall outside the scope of such special enactments.
Furthermore, even if such a waiver of confidentiality cannot be implied, this Court can still discern no legitimate or objectively reasonable expectation of privacy on the part of the pension recipients in the circumstances presented here. See,Katz v. United States, 389 U.S. 347 (1972); Webb v. City ofShreveport, 371 So.2d 316, 319 (La. App. 1979); Barry v. Cityof New York, 712 F.2d 1554, 1558-1563 (2nd Cir. 1983), cert.denied, 464 U.S. 1017.
In general, no public employee has a reasonable expectation of privacy with respect to the amount of public funds dispensed to him, Arkansas Gazette Co. v. Southern State College,620 S.W.2d 258, 260 (Ark. 1981), cert. denied and app. dism'd.,455 U.S. 931, as "[t]he precise manner of expenditure of public funds is simply not a private fact." Penokie v. MichiganTechnological University, 287 N.W.2d 304, 309 (Mich. App. 1980).See, Barry v. City of New York, supra, 712 F.2d at 1562 ("We do not think that the right to privacy protects public employees from the release of financial information that is related to their employment or indicative of a possible conflict of interest. Nor do we think the release of information that is not `highly personal' rises to the level of a constitutional violation."). See, Capital Newspapers Division of Hearst Corp.v. Burns, 490 N.Y.S.2d 651, 653 (A.D. 3 Dept. 1985) ("Since tax dollars are spent to pay public employees, the public has a right to know certain facts relating to such employment. This is not to say that public employees do not have a right of privacy. However, the acceptance of public employment carries with it a realization that certain facts relating to such employment must be public knowledge.").[12]
This Court detects no persuasive reason, and none has been advanced, why people benefiting from public funds will have their right of privacy invaded simply by disclosing records which demonstrate the manner in which they receive public funds.Mid-America Television Co. v. Peoria Housing Authority,supra, 417 N.E.2d at 213. See, Family Life League v.Department of Public Aid, 493 N.E.2d 1054, 1058 (Ill. 1986). Moreover, the records in question here are much more akin to budgetary and fiscal records than they are personal in nature. Plainly, the content of these financial records does not in any imaginable fashion reach the level of "facts `involving intimate details' of a `highly personal nature,'" nor would the disclosure of such information constitute an "`unreasonable, substantial or serious interference with the right of privacy.'" Hastings Sons Publishing Co. v. City Treasurer of Lynn, 375 N.E.2d 299, 303, 304 (Mass. 1978); Hamer v. Lentz, 525 N.E.2d 1045, 1051-52 (Ill. App. 1988), aff'd. in relevant part, 547 N.E.2d 191, 194 (Ill. 1989).
The citizenry of this State has a far-reaching and compelling interest in knowing how and why its public monies are being spent. More particularly, it is essential that the populace be informed with precision of the manner and means by which such funds are being extracted from the State's retirement account through legislation which favors those who would not ordinarily be entitled to such benefits. Mere summaries or aggregate compilations of such information, without particularity, is antithetical to the citizens' substantial and paramount interest in knowing how the public fisc is being managed and whether it is being administered equitably. Attorney General v. Collector ofLynn, supra, 385 N.E.2d at 509. See, Oberman v. Byrne,445 N.E.2d 374, 380 (Ill. App. 1983); Mid-America Television Co. v.Peoria Housing Authority, supra, 417 N.E.2d at 212; Hastings Sons Publishing Co. v. City Treasurer of Lynn, supra, 375 N.E.2d at 303-304. Put plainly, and particularly in the context of this case, the law ought not to recognize a zone of privacy in connection with that which is inherently public.
History on countless occasions has demonstrated conclusively the soundness of Mr. Justice Brandeis' decorous observation that publicity and sunlight are the most efficient of policemen. Brandeis, Other People's Money, ch. 5, p. 92 (1914 ed.). Correspondingly accurate has been Mr. Justice Cardozo's compelling sentiment that "disclosure is the antidote to partiality and favor." People ex rel. Fordham M.R. Church v.Walsh, 244 N.Y. 280, 291, 155 N.E. 575, 578 (1927). One would hope that we have not heretofore been so beguiled by changes in the scenery that we have lost sight of these principles.
* * *
The plaintiffs are without standing to maintain this action; and, even on its merits, this action cannot succeed. The plaintiffs' motion to enjoin the public disclosure of the designated records is denied.
[1] National Education Association/Rhode Island; Rhode Island Alliance of Social Service Employees, Local 580, SEIU, AFL-CIO; Government Accountability Project Foundation.
[2] Amicus National Education Association/Rhode Island has suggested that the Retirement Board cannot be directed to disclose the designated records because it is an independent board and not answerable to government control. The contention is erroneous. This State's retirement system for its public employees is principally codified in Chapters 8, 9, and 10 of Title 36, RIGL. The Retirement Board has been legislatively directed to manage this public system, and the Board is also required to report its activities to the Governor and to the legislature. § 36-8-8. In addition, the Board's administrative expenses are controlled by the general treasurer and are paid from income generated from investing those public funds. §36-8-10.1. Without question, the Board is responsive to government direction. Further, the Board is plainly an "agency" or "public body" as defined in APRA:
(a) "Agency" or "public body" shall mean any executive, legislative, judicial, regulatory, administrative body of the state. . .; including, but not limited to any department, division, agency, commission, board, office, bureau, authority, . . . or other agency of Rhode Island state . . . government which exercises governmental functions, or any other public or private agency, person, partnership, corporation, or business entity acting on behalf of any public agency. [§ 38-2-2(a).]
[3] This Court is mindful of our Supreme Court's cautionary footnote in the Pawtucket Teachers case and later repeated inProvidence Journal Co. v. Kane, supra, 577 A.2d at 664, that unlike the FOIA, APRA does not contain the modifier "clearly" preceding the phrase "unwarranted invasion of personal privacy" in § 38-2-1. That caveat, however, does not foreclose an examination of federal precedent for guidance on the issue of "reverse-APRA" suits.
[4] Accordingly, plaintiffs cannot find support in ProvidenceJournal Co. v. Kane, supra. Quite apart from the significant fact that the records at issue here in no way parallel or even approach some of the highly personal information sought in Kane
(e.g., "minority and other special status" as well as complete individual histories of personnel actions), Kane was not a reverse-APRA case. Therefore, it is not applicable here. It would be wrong to separate the holding in Kane from the circumstances and posture in which it arose and misapply it to these circumstances, which present themselves in a light completely inverse to Kane.
[5] All of the foregoing discussion makes clear that plaintiff's reliance on Rhode Island Ophthalmological Society v.Cannon, 113 R.I. 16, 317 A.2d 124 (R.I. 1974) and Ciba-GeigyCorp. v. Local No. 2548, United Textile Workers of America, 391 F. Supp. 287 (D.R.I. 1975), in an effort to assert standing to bring this action, is misplaced. Ciba-Geigy is wholely inapposite and affords the plaintiffs no authority upon which to claim standing. The Cannon case merely established a general
rule for standing (i.e., "injury in fact, economic or otherwise"). APRA, however, by its express language affords standing only to those who have been denied record access. No authority has been cited, and this Court has found none, which invites injunctive actions to thwart disclosure under access to records statutes, and all of the cases reviewed by the Court hold to the contrary. Further, nowhere in their complaint do the plaintiffs assert or allege with any particularity real "injury in fact, economic or otherwise." Absent a pleaded claim of "real adverseness, i.e., his own injury in fact," a litigant cannot assert standing. Cannon, 113 R.I. at 28. At most, the contemplated disclosure might slightly embarrass some of the recipients, but minor embarrassment, however, is no bar to disclosure; nor does it rise to the level of an invasion of privacy. City of Philadelphia v. Doe, 405 A.2d 1317, 1320 (Pa. Cmwlth. 1979); Attorney General v. Collector of Lynn,385 N.E.2d 505, 508 (Mass. 1979).
[6] "Such a right was not recognized in Rhode Island until the General Assembly at its January 1980 session enacted [RIGL §9-1-28.1]." 478 A.2d at 988 n. 2. See, Henry v. Cherry Webb, 30 R.I. 13, 41, 43, 73 A. 97, 108, 109 (R.I. 1909);Kalian v. PACE, 122 R.I. 429, 431-32, 408 A.2d 608, 609 (R.I. 1979).
[7] Indeed, a review of the Act actually discloses language of limitation, particularly in the preamble introducing the Act's exemptions in subsection (2)(d), which provides in restrictive, not plenary, fashion: "For the purposes of this chapter. . . ." [Emph. added.]
[8] That the legislature's enactment of § 9-1-28.1 was a direct result of Kalian is evidenced by the Supreme Court's final flourish at page 433 of its opinion:
That we decide against changing the rule today does not in any way preclude this court from reconsidering its position if the Legislature fails to act, and if by such failure would perpetuate injustice.
[9] Perhaps in recognition of this State's historical reluctance to recognize any right of privacy, Rhode Island has invited rather singular attention to itself in Prosser Keeton's treatise on Torts, § 117, p. 851 (5th ed. 1984):
For a time authority was divided, but along in the thirties with the benediction of the First Restatement of Torts, the tide set in strongly in favor of recognition [of a right of privacy], and the rejecting decisions began to be overruled. In one form or another the rights of privacy are recognized in virtually all jurisdictions. It is recognized only in a limited form and by statute in some states. . . . And it has even been said that the only state not recognizing a right of privacy in some form or to some extent as of 1980 was Rhode Island.
[10] See generally, Prosser Keeton, Torts, § 117 (5th ed. 1984); Prosser, Privacy, 48 Cal. L. Rev. 383 (1960), 62A Am.Jur.2d, Privacy. RIGL § 9-1-28.1 is essentially a codification of the Second Restatement of Torts, § 652A-D (1977). See, Kalian v. PACE, supra, 122 R.I. at 431-32, 408 A.2d at 609. In line with the Restatement, our statute authorizes an individual to bring a private cause of action for (1) unreasonable intrusion upon one's physical solitude or seclusion; (2) misappropriation of one's name or likeness; (3)unreasonable publicity given to one's private life; and (4) publicity which unreasonably places one in a false public light. Our Supreme Court has not had occasion to address the third strand of the statute, but a balancing test is clearly implied therein. Wisconsin's statute [W.S.A. § 895.50(2)(c)] is analogous to ours, and in Newspapers, Inc. v. Breier, supra, the Wisconsin Supreme Court approached its construction with reference to the common law: "The basic common law approach is that, where a matter of legitimate public interest is concerned, no cause of action for invasion of privacy will lie." 279 N.W.2d at 186.
[11] Since this is a reverse-APRA case, this Court concurs with the Michigan Supreme's Court's holding in Tobin v. MichiganCivil Service Commission, supra, that an action to foreclose disclosure of records within the Act "must be evaluated as if the [Act] did not exist." 331 N.W.2d at 188.
[12] Indeed, even in the context of the APRA cases, our Supreme Court has rejected notions of personal, subjective expectations of privacy. In Charlesgate Nursing Center v. Bordeleau,supra, the court said:
We also reject the argument that the subjective desire for confidentiality on the part of Charlesgate or any similar personal expectation should overcome the public interest in knowing that its tax dollars are being appropriately expended and that its public agencies are properly supervising that expenditure.
* * *
In passing [APRA], the General Assembly has presumably determined in its wisdom that the benefits of making such information public outweigh the disadvantage that may occur to those who have a subjective desire to keep the material private and confidential. [568 A.2d at 777, 778.]